**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                     No. 1:19-cr-00940-JCH

BRANDON CHARLEY,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Government's "Opposed Motion to Exclude Testimony by Defendant's Proposed Expert Witness, Joost Janssen." (ECF No. 121).

**I.    BACKGROUND**

**A. Factual Background**

According to the Government, Defendant murdered a man referred to in these proceedings as "John Doe." Both men grew up in Prewitt, New Mexico. A feud between the men's families began in the early 2000s, and several times violence has erupted in the community. On June 24, 2018, Defendant allegedly killed Doe from a distance of about fifty yards while using a Sig Sauer gun. Investigating officers never found a gun, but did recover .357-caliber casings at the scene. [1] On August 21, 2018 Defendant was charged by criminal complaint and then eventually indicted in March 2019. On November 20, 2019, a federal grand jury returned a two-count superseding indictment charging Defendant with first-degree murder in Indian country in violation of 18 U.S.C. §§ 1153 and 1111 (Count I) and using/carrying a firearm

---

[1] In another pleading, Defendant said that he will stipulate that he used this model of gun during the alleged crime. *See* ECF No. 129, 2.

during and in relation to a crime of violence and during of the course of that crime causing death through discharge of a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1) (Count II).

**B. Procedural Background**

On September 20, 2019, the Government filed an amended "Notice of Intent to Call Expert Witness Testimony" (ECF No. 102).[2] The Government intends to call Steven R. Watt (Randy), the Chief of Police of the Ogden, Utah Police Department as an expert in combat dynamics, firearms, and crime reconstruction. In his expert report, Chief Watt reviewed and analyzed documents given to him by the U.S. Attorney's Office. *See* ECF No. 105-1 at 4. Specifically, Chief Watt reviewed statements and reports from seven different fact witnesses who were present at or around the scene. In addition, Chief Watt visited the crime scene and reviewed crime scene photos and sketches.

Chief Watt applied his personal education, training, and experience with firearms and shootings to this information and drew five conclusions. However, some of those conclusions violated the prohibition on expert opinion on whether a defendant had the mental state that constitutes an element of the crime charged. *See* Fed. R. Evid. 704(b).[3] Defendant moved under Fed. R. Evid. 704(b) to exclude parts of Chief Watt's opinions and argued that his testimony failed the Fed. R. Evid. 702 analysis set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

---

[2] The Government has since amended its notice a second time, *see* ECF No. 148 (filed 12/11/2019), but this latest amendment has no impact on this Memorandum Opinion and Order.

[3] For example, Chief Watt opined that Defendant "clearly and deliberately shot at [Doe] with a pistol"; "was conscious of his actions, complete aware of the situation as it unfolded, and that he made conscious decisions to direct aimed gunfire at [Doe]" and made other similar statements. ECF No. 105-1 at 5-6.

In response, the Government conceded that parts of Chief Watt's testimony were inadmissible under Rule 704(b) and told the Court that it will limit Chief Watt's testimony to three opinions.

First, the Government proffers that Chief Watt will testify that it is hard to accurately shoot a human target with a Sig Sauer. 357 from roughly 50-yards away. In his report, Chief Watt opined that "[p]istols are challenge for the average shooter to shoot accurately, especially at distances beyond roughly 7 yards," because of their short sight plane combined with maintaining a trigger press. ECF No. 105-1 at 5. As shooting distance increases, Chief Watt explained that common shooter problems – misalignment of sights, flinches, jerks, etc. – create misfires. *Id.* Very few shooters can readily hit an intended target beyond 50 yards, and that Defendant successfully did so indicates a "very deliberate, focused effort on [Defendant's] part to shoot [Doe]." *Id.*

Second, Chief Watt will opine on "the danger of discharging a firearm at a target that is in close proximity to unintended targets." ECF No. 106 at 3. "Bullets missing their intended targets will strike something," Chief Watt opined, and that is why the general firearm rules of safety tell a shooter to "[a]lways be sure of your target, including what's behind and to the sides." ECF No. 105-1 at 5. Misses at longer distances are common with pistols, Chief Watt wrote, and therefore Defendant jeopardized "the safety of the persons in the immediate area of [Defendant's] intended target … and placed them in grave danger … especially given the extended distance and the use of the pistol." *Id.* at 5-6.

Third and finally, the Government intends to elicit testimony from Chief Watt that the Sig Sauer is consistent with a firearm possessed by Defendant in December 2010. As noted earlier, officers did not find the gun at issue. However, officers did find an empty gun case for a

Springfield XD pistol, caliber .357 Sig, with a serial number of US339053. The Government tells

the Court that in December 2010, Albuquerque police responded to a disturbance at an apartment

complex where a woman told officers that Defendant repeatedly hit her with a bag. Officers

arrested Defendant, searched the bag, and located Sig .357 pistol with the same serial number,

US339053. The Government wishes to call Chief Watt to opine that the gun from which the

bullet was fired matches shell casings with the Sig .357 Serial Number US339053.

Although Defendant filed a *Daubert* motion challenging Chief Watt's opinions, at the

motion hearing, the disputes between the parties concerning the witness's testimony greatly

narrowed. Defendant stipulated that Chief Watt is qualified by his knowledge, skill, experience,

or training to render an opinion. *See* Mot. Hr.'g Tr., ECF No. 165, 11:2-4. Defendant briefly

questioned Chief Watt about his first and second opinions and, once satisfied, told the Court that

he "had no objections to Mr. Watt[] testifying to those two opinions," 14:11-12, and withdrew

his *Daubert* motion regarding those opinions. *Id.* at 15:3-4.

As to Chief Watt's third opinion – that the Sig Sauer is consistent with a firearm

possessed by Defendant in December 2010 – Defendant objected that this issue is moot because

Defendant stipulated that he fired a .357 Sig Sauer. In response, the Government maintained its

need for Chief Watt's opinion concerning possession because "until the [D]efendant's case-in-

chief without a stipulation, the burden will be on the United States to establish that the

[D]efendant did shoot the victim," using the gun. *Id.* at 16:17-19.

At the hearing, the Court told the parties that "if for some reason [the stipulation] falls

apart, [the Court] can certainly take it up prior to the testimony and it sounds like it wouldn't

take a whole lot of time." *Id.* at 17:21-24. Accordingly, the Court **RESERVES RULING** on the

issue of Chief Watt's possible testimony concerning possession of the firearm.

As for Opinions 1 and 2, given that Defendant has withdrawn his *Daubert* challenge, the Court sees no impediment to Chief Watt testifying on those matters. That pistols are challenging for the average shooter to shoot accurately at distances exceeding seven yards because of the weapon's short sight plane combined with maintaining a trigger press are matters that are probably not common knowledge. Nor is it necessarily common knowledge that increased distance and human error increases the likelihood of misfires or that very few shooters can readily hit an intended target beyond 50 yards. Laypersons may also not be familiar with general firearm rules. Therefore, because jurors may not have specialized knowledge about these matters, Chief Watt's testimony on Opinions 1 and 2 is relevant and admissible. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1156 (10th Cir. 2013) (citing Fed. R. Evid. 702(a) (expert testimony allowed if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.")).

## II.     THE GOVERNMENT'S *DAUBERT* MOTION

### A. Joost Janssen's Expert Report and Testimony

On October 28, 2019, Defendant filed a "Notice of Intent to Offer Expert Testimony" (ECF No. 113) from Joost Janssen. Mr. Janssen is currently a military advisor to Hollywood, along with stuntman and cast-member in films, and the owner of two California businesses called Bodie International and Embark Wholesale. For about 19 years, Mr. Janssen worked for the federal government as an employee with the Central Intelligence Agency and as a Chief Petty Officer with the United States Navy Sea, Air, and Land (SEAL) Team. Before that, Mr. Janssen worked as a paramedic and emergency medical technician and holds diplomas and qualifications in those fields. Mr. Janssen has received several U.S. Navy and U.S Navy SEAL trainings, and holds military specialties in combat swimming, naval parachuting, and special operations in

medical techniques. He has been a master training specialist, a military instructor, and has also

instructed on small arms marksmanship. His time in the military earned him numerous military

awards. In his post-government career, Mr. Janssen trains Hollywood film actors on close

quarters battle scenes and helps recreate combat scenes to look realistic.

In his expert report, Mr. Janssen based his opinions on discovery material provided to

him by the defense, including a picture of the crime scene, vehicle, shots fired, the autopsy

report, and witness statements. He also reviewed Chief Watt's report and consulted three

handbooks – The Shooter's Bible, Gun Digest 2020, and USA West Marco Polo Map. Based on

these materials, Defendant maintains that Mr. Janssen is qualified to render five expert opinions.

First, a .357 Sig shot from 50-plus meters made it such that Defendant did not have "any

real hope of hitting an individual human target," and that "Charley did not have the right

weapon, training and experience to target [Doe] directly." ECF No. 113-1, 10. Specifically, Mr.

Janssen stated that in a very capable hands, a .357 Sig semi-automatic pistol could only be

effectively used out to 25 yards. Based on his experience, Mr. Janssen opined that the average

shooter could accurately shoot a target within a 7-15 yard range and that "the military's top

shooters are tested from the 7 yards line out to 25 yards and no further when shooting a semi-

auto pistol." *Id.* at 11.

"Even if Charley had been a uniquely gifted shooter," Mr. Janssen opined, "the grouping

would have been much tighter." *Id.* Mr. Janssen explained at the *Daubert* hearing that a "shot

grouping" refers to "the widest point between the impact of the bullets." Mot. Hr'g. Tr. at 40:13-

14. The shot grouping here – above the front wheel, one to the driver's door, and another at the

rear passenger area – "work[ed] out to be a group well over 4 ft wide." ECF No. 113-1 at 11.

Had Defendant trained his focus on Doe, the shot group would have been no more than 10-12

inches wide. From these facts, Mr. Janssen concluded that the firing pattern is "consistent in what would be expected from an inexperienced shooter that was aiming for the Tahoe as a whole." *Id.* Mr. Janssen echoed these statements twice more, saying that the shot pattern was "consistent with shots fired at a vehicle to disable a vehicle," and that "[i]t appears that Charley was not focusing his fire art [at Doe], but he was directing his fire at the Explorer." *Id.*

Second, citing Edward Two Eagles' and Charlinda Yazzie statements and a photograph of a wounded Yazzie, Mr. Janssen opined that "Charley and Two Eagles witnessed the aftermath of the assault and rape of Yazzie," that "Yazzie described the assault in two separate interviews," and that "Yazzie was photographed with a laceration to the forehead." *Id.*

Third, citing no source material, Mr. Janssen opined that "[Doe] initiated aggressive action towards Charley and Two Eagles." *Id.* at 12. He recounted that Doe returned to the scene armed with a bat and back-up and then threw a rock that broke the Tahoe's rear window as Defendant was leaving, all of which Mr. Janssen describes as "consistent with a perpetrator wanting to get rid of any interference or witnesses to his crime." *Id.*

Fourth, citing witness statements, Mr. Janssen opined that "Defendant and Two Eagles reported the assault to family members while they returned home to get the weapon. This demonstrates that their concern and motivation was for the victim not a grudge against [Doe]." *Id.*[4]

Fifth, Mr. Janssen opined that "[w]hen Charley and Two Eagles returned to the scene, Yazzie had not yet been pulled completely into the white Tahoe[5]. Charley's actions were

---

[4] Defendant "withdrew Opinion 4" Mot. Hr. Tr. at 25:5-6, and therefore the Court does not analyze, rely upon, or adjudicate Opinion 4.

[5] Mr. Janssen presumably is referring to the white Ford Explorer.

consistent with an attempt to stop a crime in progress and to prevent Morgan from dragging …

Yazzie into the Tahoe." *Id*. Mr. Janssen cited no source material in support of his fifth opinion.

At the *Daubert* hearing, Mr. Janssen explained that Opinions 2, 3 and 5 are "basically

reading the witness reports and looking for something that would interfere with my theory which

is Point 1, so the rest of the points is just support of my initial Point 1." Mot. Hr'g. Tr. at 27:11-

16. The Court interprets this to mean that Opinions 2, 3 and 5 are not necessarily expert opinions,

but instead data-points that Mr. Janssen used in his analysis.

**B. Legal Standard**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education, may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will
        help the trier of fact to understand the evidence or to determine a fact
        in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods, and
    (d) the expert has reliably applied the principles and methods to the facts
        of the case.

Fed. R. Evid. 702 (2011). *See also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990

(10th Cir. 2006) (describing analysis as two-steps: (1) determining whether expert is qualified

and (2) whether the expert's opinion is reliable under *Daubert* principles). The touchstone of

admissibility under Rule 702 is helpfulness to the trier of fact. *See Werth v. Makita Elec. Works,*

*Ltd*., 950 F.2d 643, 648 (10th Cir. 1991).

A court should consider the following non-exhaustive and non-dispositive factors in

determining whether particular expert scientific testimony is reliable: whether the expert's

technique or theory can and has been tested; the theory has been subject to peer review and

publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and the general acceptance of the methodology in the relevant scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999); *103 Investors*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). The *Daubert* Court clarified that the focus must be solely on the principles and methodology, not on the conclusions they generate. *Daubert*, 509 U.S. at 595. With other non-scientific experts, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150 (emphasis added).

Expert witnesses may testify about ultimate issues of fact, but an expert may not state legal conclusions drawn by applying the law to the facts. *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015). Although an expert may not give an impermissible legal conclusion, an expert may give testimony that embraces an ultimate issue so long as the expert's testimony assists, rather than supplants, the jury's judgment. *Id.* (quoting *United States v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir. 2005)); *United States v. Schneider*, 704 F.3d 1287, 1293 (10th Cir. 2013) (stating that Rule 704(a) allows expert opinion on an ultimate issue so long as he explains basis for any summary opinion and does not simply tell the jury what result to reach). "Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field." *Richter*, 796 F.3d at 1195.

Where an expert witness's testimony is based on his experience, the expert witness must explain how his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (quoting Fed. R. Evid. 702 advisory committee's

note (2000)). It is improper for a legal expert to supplant the court's duty to set forth the law and the jury's duty to apply the law to the evidence. *See Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).

To determine whether an expert opinion is admissible, the district court performs the following two-step analysis: (1) the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion, and (2) if the expert is so qualified, the court must determine whether the expert's opinion is reliable under the principles set forth in *Daubert*. *See 103 Investors I, L.P.*, 470 F.3d at 990. *Daubert*'s general holding setting forth the judge's gate-keeping obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge. *Kumho Tire*, 526 U.S. at 141. Trial courts have equally broad discretion in both determining the reliability and admissibility of expert testimony and in deciding how to assess an expert's reliability, including what procedures to use in making that assessment. *See United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000). So long as the district court has enough evidence to perform its duty in assessing the relevance and reliability of an expert's proposed testimony, a hearing is not required. *See United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997). The proponent of the expert bears the burden by a preponderance of the evidence to establish that the requirements for admissibility have been met. *See Nacchio*, 555 F.3d at 1251.

**C. Application to Mr. Janssen**

**1. Expertise**

At the *Daubert* hearing, the Government stipulated that Mr. Janssen is qualified to testify as an expert in small arms marksmanship. *See* Mot. Hr'g. Tr. at 21:21-24. Given this stipulation, the Court proceeds to the second *Daubert* inquiry – whether Mr. Janssen's opinions are reliable.

**2. Methodology**

**i. Opinion 1 is Partially Admissible**

In analyzing a challenge to an expert's methodology, a "trial court's focus generally should

not be upon the precise conclusions reached by the expert, but on the methodology employed in

reaching those conclusions." *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233 (10th Cir.2004).

"Although it is not always a straightforward exercise to disaggregate method and conclusion, when

the conclusion simply does not follow from the data, a district court is free to determine that an

impermissible analytical gap exists between premises and conclusion." *Id*

Again, Mr. Janssen's proffered expert conclusion is that, if Defendant had trained his aim

on Doe, Defendant's shot grouping would have been no more than 10-12 inches wide and that

because the shot grouping was "well over 4 ft wide," Defendant's firing pattern was "consistent

in what would be expected from an inexperienced shooter that was aiming for the Tahoe as a

whole," instead of a human target. At the hearing, Mr. Janssen opined that – assuming a 50-

meter[6] distance between shooter and a human target – an expert shooter's shot grouping would

be between three and five inches, a "competent shooter maybe 12," and "someone who just owns

a gun like [] the defendant … should be able to do within a 20-inch group when shooting at a

small target." Mot. Hr'g. Tr. at 26:10-14.

Looking at methodology, the Court can discern only three main data points supporting

Mr. Janssen's opinion. First, he reviewed The Shooter's Bible and Gun Digest 2020. However,

he did not say if these source materials endorsed his theory regarding the shot grouping of an

inexperienced shooter, and merely saying that one reviewed the relevant literature is not itself

---

[6] At the hearing, Mr. Janssen alternated between using yards and meters when describing the distance.

methodology. Second, he testified that his opinion was grounded in his experience training 300-400 inexperienced shooters. *See* Mot. Hr'g. Tr. at 45:10-19. Third, he said that although many variables can influence a shooter's accuracy, "the biggest variable … is the intended target," – meaning the target's size. *Id*. at 44:15-17.

While Mr. Janssen's experience properly informs his opinion, the problem is that his conclusion amounts to an untested hypothesis. For his opinion to be reliable, Mr. Janssen would have to compare exemplar shot groupings by experienced versus inexperienced shooters. He would also have to show exemplar shot grouping by an inexperienced shooter aiming at either a small or large target. Although he did opine that an expert shooter's grouping would be between three and five inches from 50-meters, whereas as inexperienced shooter's grouping would be within 20-inches, the basis for that statement is unclear and Mr. Janssen never identified the material endorsing that opinion. Because the Court is unable to discern a methodology, Mr. Janssen is prohibited from testifying that Defendant's shot grouping is more consistent with aiming at a vehicle rather than a human target and other similar statements.

Mr. Janssen may permissibly testify, however, about the relative skills of expert versus inexperienced shooters, the shot groupings of inexperienced shooters based on his experience training 300-400 such shooters, the inherent limitations of the firearm at issue when fired at increased distance, and variables that influence a shooter's accuracy, including the size of the intended target. Laypersons may not be familiar with these matters, and the Government conceded that some of these matters are proper subjects for expert opinion. *See* Mot. Hr'g. Tr. at 50:10-15. Mr. Janssen may not testify, however, that Defendant's shot grouping indicated that Defendant was aiming for a vehicle target rather than a human target.

### ii. Opinions 2, 3 and 5 are Excluded as Expert Opinions

At the *Daubert* hearing, Mr. Janssen said that Opinions 2, 3 and 5 are "just support of my initial Point 1," Mot. Hr'g. Tr. at 27:15-16, and "were written in there just to show that there was no conflicting information in the materials given that would disprove Point 1." *Id*. at 31:1-4. And when the Court asked Defendant's lawyer for clarification about whether Mr. Janssen will only testify about Opinion 1, Defendant answered "yes." *Id*. at 33:5-8.

For the sake of a clear record, the Court holds that Mr. Janssen may not testify as expert on Opinions 2, 3 and 5 for various reasons – the main one being that expert testimony is unnecessary. Opinions 2 and 3 – that "Charley and Two Eagles witnessed the aftermath of the assault and rape of Yazzie," and that "[Doe] initiated aggressive action towards Charley and Two Eagles," are based on nothing more than hearsay and can be established by lay testimony. Opinion 5 – that Defendant's actions were consistent with an attempt to stop a crime in progress and to prevent Doe from dragging Yazzie into a vehicle – relies on no methodology, vouches for Defendant's rendition of events, and does not require expert testimony. This ruling does not, however, prevent Mr. Janssen from telling the jury that he relied on out-of-court witness statements and other data when performing his analysis.

**IT IS THEREFORE ORDERED that** the United States' Opposed Motion to Exclude Testimony by Defendant's Proposed Expert Witness, Joost Janssen **(ECF No. 121)** is **GRANTED**.

**IT IS SO ORDERED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE