IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>  )<br>  Plaintiff,   )<br>  )<br>vs.   )<br>  )<br>**BRANDON CHARLEY**,   )<br>  )<br>  Defendant.   ) | Cr. No. 19-00940-JCH |

## UNITED STATES' OPPOSED MOTION
## FOR SWORN TESTIMONY VIA VIDEO CONFERENCE

The United States of America moves this Court to permit sworn testimony via video conference at trial from FBI Laboratory witnesses Megan Grimes, Margaret Waldron, Melissa Ramirez, Crystal Cauley, Kyla Binfet, Karla Wright, Lily Wong, Michelle Morris, and Jessica Weise who performed foundational portions of the DNA analysis process.  FBI Forensic Analyst Elizabeth Talley will testify in person and provide comprehensive expert testimony about DNA evidence, the process of its analysis, and the results in this case.  In a more perfect world, this motion would be unnecessary.  But, due to the refusal of defense counsel to stipulate to even the most pro forma evidence, and the extraordinary obstacles imposed by the COVID-19 pandemic, video testimony is necessary.  Without such video testimony, the United States would be placed in the unenviable position of having to entertain a motion to continue or abandonment of crucial DNA testimony.  Thus, the United States should be permitted to present evidence from its out-of-state, foundational DNA witnesses on the scheduled trial date of March 15, 2021.[1]

---

[1] It should be noted that the United States attempted to try this case prior to the pandemic.  A continuance was granted over the objection of the United States.  (Doc. 156).  Even though no one could have predicted the pandemic, if this current motion is denied, the United States will be severely prejudiced by that earlier, opposed continuance.

**I.     FACTS**

On June 24, 2018, Defendant shot an unarmed John Doe in cold-blood from a distance of about fifty yards.  Defendant fled the area and hid the firearm he used to kill Doe.  The FBI responded to the scene and located, among other things, John Doe's deceased body, blood stains in the dirt, blood in the backseat of a disabled Ford Explorer, and two shirts near the scene.  They collected evidence and swabbed multiple areas of evidentiary importance, including John Doe's genitals.  The FBI sent the evidence to the laboratory in Quantico, Virginia, for DNA analysis.

The FBI DNA unit utilizes a division of labor method to compare DNA.  Much of the process is automated, so the human witnesses often merely transfer and record pieces of evidence for the eventual analysis.  The first step, in which pieces of the subject evidence are removed and placed in a tube is called "collection."  Crystal Cauley, Kyla Binfet, and Megan Grimes performed the collection phase on different pieces of evidence.  After the collection phase, the laboratory moves into the "extraction" phase.

During extraction, the FBI laboratory treats the collected evidence with heat and chemicals to release the DNA into a liquid solution for analysis.  Karla Wright and Margaret Waldron performed the extraction phase on different pieces of evidence.  After the extraction phase, the laboratory moves into the "quantification" phase.

During quantification, additional chemicals are added to the liquid extract and an automated instrument transfers a portion of the extract to a plate.  The plate is placed on an instrument that processes the samples to determine the amount of DNA in the extract.  Karla Wright and Melissa Ramirez performed the quantification phase on different pieces of evidence.  Following quantification, the laboratory moves into the "amplification" phase.

During amplification, the DNA extract on the plate is transferred with chemicals to an automated instrument that replicates the DNA in the sample to create a larger quantity for analysis. Melissa Ramirez and Lily Wong performed the amplification phase on different pieces of evidence. Finally, another automated instrument transfers the extract and chemicals to a new plate that is placed on an instrument which uses an electrical charge to force the DNA through a narrow tube where it is imaged to generate a profile. Michelle Morris prepared the instrument for this phase of analysis for some of the evidence. These profiles are recorded and compared using the STRMix software.

In addition to DNA testing, the unit often analyzes evidence for blood or semen. Initially, the biologists use presumptive chemical reagents to determine if additional analysis needs to occur. If there is a presumptive positive, the color of the sample changes and the samples are processed using additional chemicals and viewed under a microscope to confirm the presence of semen or blood. In this case, Jessica Weiss performed a presumptive test for semen, which was negative, warranting no additional testing. Crystal Cauley performed a presumptive test for blood, which was positive. The results of the positive test were confirmed using a microscope by the expert witness, Elizabeth Talley, who will testify about them at trial.

During the course of the analyses at the DNA Unit, strict operating procedures are adhered to and confirmed by each and every witness. These operating procedures have been validated internally and are subjected to periodic internal and external audits. All of the discovery relating to the testing was provided to counsel for defense and has not been contested.

The results of the DNA analysis provided valuable evidentiary support for the United States' allegations and contradictions of Defendant's self-defense/defense-of-another claims.

First, the blood that was located in the back of the Ford Explorer was confirmed to belong to John Doe.  This indicates that Doe bled in the back-seat of the vehicle, supporting the prosecution witness's accounts that Doe was attempting to flee the area with them at the time of the shooting.  Doe's attempted flight from the area renders Defendant's claim that he had to immediately and reasonably use deadly force to defend someone unlikely.

Second, the blood that was located on the ground near the Ford Explorer was confirmed to belong to John Doe.  Compared to the location of the shell casings, this confirms that Defendant shot Doe from a great distance.  The distance not only contradicts Defendant's self-defense or defense of another claim, but indicates deliberate intent since accurate pistol marksmanship at that distance is difficult.

Finally, there was no DNA unlike John Doe's on his genital swabs.  Since the crux of Defendant's defense-of-another claim is that he believed Doe raped an unresponsive woman found at the scene, the absence of female DNA on Doe's genitals contradicts this preposterous account.

At trial, the United States does not anticipate that any of the above listed witnesses will testify for longer than five minutes.  Conversely, the United States' expert Elizabeth Talley will testify, in-person, about the entire process of DNA analysis and the methods used by the FBI laboratory to generate the reliable results.  Therefore, compelling nine witnesses to travel from the east coast, during an unprecedented pandemic, would be obtuse, unnecessary, and potentially dangerous.

**II. Applicable Law**

"The right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v.*

*Mississippi*, 410 U.S. 284, 295 (1973). While "the Confrontation Clause reflects a preference for face-to-face confrontation at trial, that preference must occasionally give way to considerations of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849 (1990)(emphasis in the original)(internal citations and quotations omitted).

In *Craig*, the state of Maryland invoked a statutory procedure permitting a judge to allow a child sex-abuse victim to testify via one-way closed circuit television. That statute permitted such testimony if the court determined that the child's live testimony would result in the child suffering serious emotional distress such that he or she could not reasonably communicate. *Id*. The child, prosecutor, and defense counsel went to another room for the testimony, and the defendant, judge, and jury remained in the courtroom. *Id*. The child victims were allowed to testify in this manner, and the issue was taken up on appeal. *Id*. In analyzing whether such a procedure ran afoul of the Confrontation Clause, the Supreme Court of the United States held:

> The Confrontation Clause does not guarantee criminal defendants an absolute right to a face-to-face meeting with the witnesses against them at trial. The Clause's central purpose … is served by the combined effects of the elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier or fact. Although face-to-face confrontation forms the core of the Clause's values, it is not an indispensable element of the confrontation right … Nonetheless, the right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the testimony's reliability is otherwise assured.

*Id*. at 836-37 (citing *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988)). The Court went on to recognize that states have a compelling interest in protecting minor victims of sex crimes from further trauma and embarrassment (citations omitted) and declined to second-guess Maryland's interest in protecting the welfare of its children. *Id*. at 838. In reaching this holding, the Court determined that an evidentiary hearing must be held to determine that denial of face-to-face

testimony is necessary to further an important public policy, and that the reliability of the testimony is otherwise assured.  *Id.* at 850, 855.

Since *Craig*, several other cases have clarified what are and are not "important public policies."  In *United States v. Yates*, 438 F.3d 1307 (11th Cir. 2006), a district court applied the *Craig* test to permit witnesses in Australia to testify by two-way video conference at trial in Montgomery, Alabama.   However, the court did not hold a hearing, and relied on the United States' assertions that the Australians were unwilling to travel to the U.S. for trial, and that the important public policies were to provide the fact-finder with crucial evidence, and resolve the case expeditiously and justly.  *Id*. at 1315-16.  The Eleventh Circuit reversed, holding that even though the Government's presentation of crucial evidence is an important public policy, the availability of a Rule 15 deposition basically subtracts from the prosecutor's need for video conference testimony in that circumstance.  *Id*. at 1316.

Regarding the option of a Rule 15 deposition, the court found no evidentiary support for a case–specific finding that the witnesses and Defendants could not be placed in the same room for the taking of pre-trial deposition testimony pursuant to Rule 15, specifically noting that the parties could have traveled to Australia.  *Id*. 1317-18.  The court also specifically stated the Government never advocated any special circumstance created an inability to take such a deposition or that it would have been impossible to allow Defendants to attend such a deposition. *Id.* at 1318.

In *United States v. Rosenau*, 870 F. Supp. 2d 1109, 1112 (W.D.Wa. 2012), a witness was allowed to testify remotely from Canada because that witness had been sued by the defendant in British Columbia and a default judgement prohibited the witness from entering the United States.  Further, the Canadian government would not allow the defendant to travel to Canada, and the US

Marshals Service would have been unable to maintain control of the defendant outside the United States. *Id*. The court also stated there was an important public policy interest in allowing the United States to try cases regarding international smuggling of narcotics, and in ensuring the national forests are not used as staging grounds to facilitate the introduction of contraband into the U.S. *Id.* Furthermore, the procedures used to take such testimony surpassed those approved in *Craig*, due to overall better technology, and a second appointed attorney to cross-examine the witness in person. *Id*. at 1113.

In *United States v. Benson*, 79 F. App'x 813, 820-21 (6th Cir. 2003), the Sixth Circuit upheld a district court's decision to allow an eighty-five-year-old victim of fraud to testify via video conference. They found sufficient evidence was presented that the witness was too ill to travel, and the procedure was also consistent with the ruling in *United States v. Gigante*, 166 F.3d. 75, 80 (2d Cir. 1999) (closed circuit television procedure preserved characteristics of in-court testimony including swearing in, full cross examination, testimony in full view of the parties and the court, and was visible to the defendant).

More recently, in *United States v. Donziger*, 2020 WL 4747532 (S.D.N.Y. Aug. 17, 2020), a district court denied a defense motion for continuance based on a variety of factors, including Covid-19. While not directly addressing the issue, that court observed:

> While the Court will not rule on the Government's motion for remote testimony before it is made, the Court notes that depending on the circumstances of the Government's witness, remote testimony may comport with the Sixth Amendment principles set forth in Craig and Gigante. At least in in some instances, allowing remote testimony may be needed to promote the strong public interest in avoiding exposing at-risk individuals to COVID-19 and minimizing further spread of the virus. And depending on the witness's situation, the health risks and travel restrictions occasioned by the ongoing pandemic may also constitute "exceptional circumstances" that would permit the use of video testimony. While no motion for video testimony has been made, suffice it to say that such a motion would not be dead on arrival.

*Id*. at *3 (citing *Craig* and *Gigante*).

Suffice to say, these cases demonstrate the right of confrontation is not absolute, and public policy concerns regarding the health and welfare of witnesses and the impacted communities are legitimate and valid bases for authorizing remote testimony.

**III. Argument**

In this case, there are several important public policies at issue.  The prosecution of murder on tribal lands is an important public policy.  If the prosecution of international drug smuggling is an important public policy, as it was in *Rosenau*, then certainly the fight against violent crime is too.  Furthermore, the victim's family in this case has a right to a resolution.  More than two and a half years is a long time to wait, and they deserve to have some closure.

Another glaring public policy is the COVID-19 pandemic and limiting the spread of the virus.  It is contrary to important public policy to have nine witnesses travel interstate to give face-to-face testimony regarding foundational matters.  The nine witnesses live near Quantico, Virginia.  Furthermore, the FBI laboratory in Quantico has experienced at least a dozen cases of COVID-19 infection at its facility.  While under normal circumstances, their in-person testimony could easily be arranged, the country and the world is currently dealing with the COVID-19 pandemic which has significantly impacted the way in which we travel and work.

To facilitate in-person testimony, witnesses would need to travel to New Mexico from northern Virginia.  The Center for Disease Control has discouraged travel during the pandemic.  https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html.  Travel from northern Virginia is even more risky than from neighboring states because it almost certainly

requires at least one lay-over, amplifying the exposure of the witnesses to populations in multiple areas.

Furthermore, local accommodations have been impacted by the pandemic. https://www.abqjournal.com/1473239/hotels-look-to-reopen-during-the-pandemic.html. Although hotels may be currently available, the situation in March remains to be determined. As this Court is aware, various quarantining restrictions have been imposed upon interstate travelers throughout this pandemic. If such a restriction was placed on the witnesses in March, they could be forced to quarantine for fourteen days. During these periods of pandemic induced isolation, the witnesses would be unavailable to perform their regular duties at the lab or to testify in other federal trials for an inordinate amount of time.

Millions of Americans have been ordered to stay at home and avoid travel and large crowds. The virus has shut down businesses, impacted the stock market, and overwhelmed the country's healthcare resources. The longer we live with this, the more evident it becomes that there is no predictable end. Some locales will see improvement, and some places will get worse. This important public policy of preventing more infections and death is a compelling reason to allow remote testimony as requested in this motion.

The United States, prior to filing this motion, explored other options. No realistic ones exist. The United States does not have the option of a Rule 15 deposition because the same public policy concerns are present for travel on either end. That is to say, a Rule 15 deposition would require prosecutors, defense attorneys, and agents to fly to Virginia– a COVID hot spot - to conduct the depositions. Though the concerns are somewhat lessened with the attorneys traveling to Virginia, they are still there, and that option requires four to five people to travel. Furthermore, Defendant cannot easily be transported to Florida for the deposition because he is

in third-party custody at La Pasada. The logistics of transporting him and maintaining security in another state, and contending with their COVID-19 policies, makes such an option unworkable.

A continuance is not an alternative solution because the pandemic could continue for years. As recent history has demonstrated, we could even see an increase in cases. Virginia and New Mexico may not always be experiencing the pandemic at equal force. Continuing the case until the end of the pandemic could take years, which is untenable given that this is already two and a half years old.

It is well worth noting that none of the above-referenced witnesses are accusing Defendant. The nature of their testimony does not require an in-court identification. In fact, the United States only intends to elicit foundational testimony from these witnesses to satisfy reliability requirements of Elizabeth Talley's opinions, much of which must be done before the jury without a stipulation otherwise. Finally, being in the presence of Defendant will not have an effect on these witnesses, since they have no personal involvement with him and cannot even identify him.

Certainly, the current situation was not anticipated by the higher courts, however they have left the option open for such a situation. If a global pandemic does not constitute an important public interest, the United States is at a loss as to what might. This Court itself, as well as other courts across the country, have closed down due to the COVID-19 pandemic. Jury trials and grand jury proceedings were halted for a period of time, and most other proceedings were done remotely, to include detention hearings which directly bear on a defendant's liberty. In fact, Congress passed a law to allow for video participation in hearings to permit the justice system to move forward safely without running afoul of rules and laws demanding live, in-person presence. The unprecedented nature of the pandemic make many of the cases discussing

video testimony somewhat inapposite. There is no end in sight to this pandemic, but we cannot completely halt the criminal justice system when there are viable ways to work around the issues. To be sure, the United States is not suggesting by this motion that video testimony should be permitted for any witness who is in anyway inconvenienced by the need to testify during the pandemic. Rather, it is the specific and unique harms to the nine witnesses identified above, their respective communities, and the state of New Mexico that support this motion.

For the foregoing reasons, the United States respectfully requests that this Court hold a hearing to determine whether important public policies allow for remote sworn testimony in this case, and devise a proper and reliable procedure to conduct remote testimony from the nine witnesses identified above.

        Respectfully submitted,

        JOHN C. ANDERSON
        United States Attorney

        *__Electronically filed November 16, 2020__*
        JOSEPH M. SPINDLE
        LETITIA CARROLL SIMMS
        Assistant United States Attorney
        Post Office Box 607
        Albuquerque, New Mexico 87103
        (505) 346-7274

I HEREBY CERTIFY that on November 16, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the below counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Filed Electronically*
Joseph M. Spindle, Assistant U.S. Attorney